IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Gerald Reed (N-32920),      )
      )
      Plaintiff,      )
      )      Case No. 12 C 8582
      v.      )
      )      Judge James B. Zagel
P. Kirk, et al,      )
      )
      Defendants.      )

## MEMORANDUM OPINION AND ORDER

Plaintiff Gerald Reed, a prisoner confined at Stateville Correctional Center proceeding *pro se*, brought this 42 U.S.C. § 1983 action asserting in his amended complaint that correctional officer retaliated against him for filing a lawsuit and that prison officials failed to protect him from a known and serious danger. Named as Defendants are several Illinois Department of Corrections (IDOC) officials, and a prison psychiatrist, Dr. Phyllis Tolley, employed by Wexford Health Sources, Inc., and stationed at Stateville. Before the Court are Tolley's motion for summary judgment (Dkt. Nos. 94-97), the IDOC Defendants' motion for summary judgment (Dkt. Nos. 99-102, 156), and the IDOC Defendants' motion to strike. (Dkt. No. 156.) Plaintiff has responded to the summary judgment motions. (Dkt. Nos. 118-121, 134-137, 154.) For the reasons that follow, the Court denies the IDOC Defendants' motion to strike, denies Tolley's summary-judgment motion, and grants in part and denies in part the IDOC Defendants' summary-judgment motion.

## BACKGROUND

Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time

combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted). Under Local Rule 56.1(a)(3), the moving party must provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (quoting N.D. Ill. L.R. 56.1(a)); *see also* Fed. R. Civ. P. 56(c). The opposing party must then "file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Cracco v. Vitran, Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (quoting N.D. Ill. L.R. 56.1(b)(3)(B)). The opposing party may also present a separate statement of additional facts that requires the denial of summary judgment. *See Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008) (citing N.D. Ill. L.R. 56.1(b)(3)(C)).

The parties have generally complied with Local Rule 56.1; Defendants submitted Statements of Uncontested Facts, (Dkt. 95, 100), to which Plaintiff responded. (Dkt. 121, 134, 154.) Plaintiff also submitted exhibits, including his own affidavits. (Dkt. 121, 134, 154.) Defendant Tolley responded to Plaintiff's affidavit providing additional undisputed facts. (Dkt. 131.) Plaintiff, during briefing, twice moved to compel additional discovery from the IDOC Defendants. (Dkt. 123, 139, 141, 151.) The Court both times suspended summary-judgment briefing to consider Plaintiff's arguments. (Dkt. 133, 143.) The Court then permitted Plaintiff to submit a supplemental response to the IDOC Defendants' motion for summary judgment. (Dkt. 151.)

The IDOC Defendants argue that Plaintiff's response to their Rule 56.1 Statement of Facts is improper in several ways, in that Plaintiff: (1) in some instances fails to explicitly respond to the entirety of each statement; (2) in some places inserts legal argument regarding his requests for

discovery; and (3) provides responses inconsistent (Defendants argue) with Plaintiff's deposition testimony. Defendants therefore seek to strike Plaintiff's entire response to their 56.1 Statement. The Court declines to wield the requested sledgehammer to address problems with Plaintiff's response; the IDOC Defendants' motion to strike is denied. Defendants notably do not argue that any of Plaintiff's exhibits are inadmissible; they rely on many of the same exhibits. The Court will consider Defendants' arguments as to responses they specifically challenge, and for which they include an explanation and supporting argument.

The facts, therefore, are taken from Defendants' undisputed N.D. Ill. Local Rule 56.1 Statements of Material Facts ("SOF") and facts included in Plaintiff's responses and supporting affidavits, where he is competent to testify as to those facts or they are supported by record evidence. *See Koszola v. Bd. of Educ. of City of Chi.*, 385 F.3d 1104, 1109 (7th Cir. 2004) (stating that courts may decide a summary judgment motion based on a factual record established by the parties' Rule 56.1 Statements). The Court accepts as true any undisputed statements of fact from Defendants' statements. Where Defendants' statements are properly supported by the cited materials and are not disputed by evidence Plaintiff raises, including his deposition testimony (Dkt. 100-2, Dkt. 100-3, Dkt. 100-4) and affidavits (Dkt. 121, at 221-22; Dkt. 134, at 6-8), the Court will consider those statements as undisputed. *See* Local Rule 56. 1(b)(3)(C); *see also Almy v. Kickert Sch. Bus Line, Inc*., No. 08-cv-2902, 2013 WL 80367, at *2 (N.D. Ill. Jan. 7, 2013) ("[C]ourts are not required to 'wade through improper denials and legal arguments in search of a genuinely disputed fact.'") (quoting *Bordelon v. Chi. Sch. Reform Bd. of Trs*., 233 F.3d 524, 529 (7th Cir. 2000)); *but see Bentz v. Hardy*, No. 15-1344, ---- Fed. App'x ----, 2016 WL 1391851, at *1 (7th Cir. Apr. 8, 2016) (finding that, even where plaintiff failed to respond properly to statement of

uncontested facts, "[t]hat misstep was not fatal" because defendants chiefly relied upon plaintiff's discovery deposition as their evidentiary source, rendering his account of prison conditions undisputed). The Court will, of course, not consider factual statements as refuted by purely legal arguments, incomplete responses that lack evidentiary support, or responses that are inconsistent with deposition testimony. The Court also will not consider Plaintiff's objections regarding not being provided with discovery, only to the extent that those objections are contrary to the Court's order of March 9, 2016. (Dkt. 151.)

Even to the extent Plaintiff failed to otherwise comply with Local Rule 56.1, it would not "automatically result in judgment for the movant," as "[t]he ultimate burden of persuasion remains with [the movant] to show that [he] is entitled to judgment as a matter of law." *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). The Court will not, however, dig through the record to identify disputed issues of fact that are not otherwise supported. *See Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) ("In considering a motion for summary judgment, the district court is not required to scour the record in search of evidence to defeat the motion; the nonmoving party must identify with reasonable particularity the evidence upon which the party relies."). With these guidelines established, the Court turns to the facts of this case.

## FACTS

Plaintiff is and was at all relevant times an inmate confined at the Stateville Correctional Center (Stateville). (Dkt. 100, IDOC Def. SOF ¶ 1; Dkt. 134, Pl. Resp. IDOC SOF ¶ 1; Dkt. 95, Tolley SOF ¶ 1; Dkt. 121, Pl. Resp. Tolley SOF ¶ 1). Plaintiff walks with a crutch because he has a "rod" and "pins" in his leg, and some of the pins "broke." (Dkt. 100-2, at 21.) The Court infers, as the IDOC Defendants have not provided this information, that Defendants Perry Kirk, Yvonne

Bishop, Marcus Hardy, Daryl Edwards, Daryl Coleman, Margaret Thompson, and Ada Johnson were officials of the Illinois Department of Corrections (IDOC) at the relevant time. The Court gleans from Plaintiff's unchallenged allegations, that, at the relevant times, Defendant Perry Kirk[1] was a corrections officer and then a lieutenant at Stateville; Yvonne Bishop was a former lieutenant and/or adjustment committee chairperson for IDOC; Marcus Hardy was a former warden of Stateville; Daryl Edwards was a former warden of Stateville; Daryl Coleman was a former warden of security at Stateville; Margaret Thompson was a counselor at Stateville; and Ada Johnson was a placement officer at Stateville. (Dkt. 100-1, at 2-3.) Defendant Dr. Phyllis Tolley was employed by Wexford Health Sources, Inc. (Wexford) as a psychologist and crisis team leader at Stateville. (Tolley SOF & Pl. Resp. Tolley SOF ¶ 1.)

By August of 2011, according to Plaintiff, Plaintiff and Kirk had a strained relationship. Before then, Plaintiff, who was sleeping on his metal bed frame, had requested a mattress from then-correctional officer Kirk, who denied his request, saying Plaintiff would get a mattress when they had one. (Dkt. 100-3, at 128-29.) In July, Kirk failed to promptly escort Plaintiff back to his cell after a visitation. (IDOC Def. SOF ¶ 1.)[2]

Plaintiff submitted an emergency grievance that appears to be dated September 1, 2011 (although the parties also seem to refer to it as being submitted on August 30, 2011 (Def. SOF ¶ 20; Dkt. 100-5)), which was assigned No. 3623. In that grievance, Plaintiff states that, on August 22, as Plaintiff headed to chow, Kirk made him step out of line to tell Plaintiff that he did not care about Plaintiff's disability and that Plaintiff needed to keep up with the line or stay in the cell. (Dkt. 100-

---

[1] Kirk, who apparently is no longer employed with IDOC, is or was facing criminal charges related to his prior employment. The Court understands those charges to not directly relate to Plaintiff's allegations but has not yet ruled upon the admissibility of any evidence regarding such charges or any conviction. (See Dkt. 151, at 2.)

[2] Plaintiff provided information regarding these earlier incidents only as background, not as part of his substantive claim. (Pl. Resp to IDOC SOF ¶ 6.)

3, at 128-29; Dkt. 100-1, at 18, 21; Dkt. 100-5, at 5-6.) Plaintiff also stated that Kirk had harassed him in unspecified ways and had "stared in [Plaintiff's] direction for about 10 minutes" and then "point[ed] his trigger finger at" Plaintiff before Plaintiff was informed he would be moving to a new cell. (Dkt. 100-3, at 128-29; Dkt. 100-5, at 5-6.) Plaintiff found this interaction "scary." (*Id*.)

Plaintiff now provides further details regarding his alleged encounters with Kirk. Plaintiff states that, in August 2011, after Kirk observed another officer conduct the routine pre-chow pat-down of Plaintiff, Kirk did an "aggressive" second pat-down search, threatening Plaintiff with segregation if he found him to be carrying anything other than identification. (IDOC Def. SOF ¶ 8; Dkt. 100-2, at 20:18-21:23.) The pat-down caused Plaintiff pain in his leg, although he did not seek medical treatment. (Dkt. 100-2, at 26:11-27:15.) Plaintiff sought to see a mental health crisis team member; when informed that Kirk was a crisis team member, he requested to see Dr. Tolley. (Dkt. 100-2, at 9:16-10:14.) He then wrote to Dr. Tolley on August 23. (Tolley SOF ¶ 16.) On August 25, 2011, Dr. Tolley visited Plaintiff in his unit, F House, but Kirk would not allow the door to be closed for a private discussion. (*Id*.) On August 30, 2011, Kirk pointed his finger at Plaintiff as if he were firing a gun at Plaintiff. (IDOC SOF ¶ 9.) Plaintiff was then informed that he was to be assigned a new cellmate named Croutter. (IDOC SOF ¶ 11.) Plaintiff protested against this arrangement, due to Croutter's reputation for fighting, sexual orientation, and HIV-positive status. (*Id*.) Plaintiff sought protective custody but says Kirk caused his placement to be delayed until the next day. (*Id*.; Dkt. 134, at 6.) On August 31, Plaintiff was placed in protective custody in X House. (IDOC SOF ¶ 11.)

Shortly after his placement in protective custody, Plaintiff was assigned a different cellmate, Reese.[3] (Dkt. 134, at 6.) On September 6, 2011, Plaintiff put up signs stating that he was on a hunger strike due to being assigned Reese as a cellmate. (Dkt. 134, at 7; *see also* Dkt. 100-1, at 22.) A non-Defendant correctional officer talked him out of the hunger strike and advised that Plaintiff instead write to Ada Johnson, who could help with getting the cellmates reassigned. (*Id.*) On September 7, 2011, Plaintiff wrote to Johnson, stating that "[a]s of Friday me and my cell mate now been having stand-off. Not fight which I'm trying to avoid. Last nite I written to go on a hunger-strike, and the sgt said it would not be a good idea, so I pull back . . . [and] just stayed out of my room-mate way and layed in the bed." (IDOC Def. SOF & Pl. Resp. IDOC SOF ¶ 3; Dkt. 100-1, at 22.) He requested that Johnson move him. (IDOC Def. SOF & Pl. Resp. IDOC SOF ¶ 3; Dkt. 100-1, at 22.) A few days later, while he performed a security check in Plaintiff's unit, Kirk said loudly and within Reese's hearing that Plaintiff was a "stool pigeon,"[4] which is akin to labeling him a "snitch" and put him in a "bad position." (Tolley SOF ¶ 24; Dkt. 100-1, at 31; Dkt. 134, at 7; Dkt. 100-2, at 75:6-20; 79:12-20.) On September 14, 2011, Plaintiff met with Dr. Tolley and explained his concerns regarding Reese. (Tolley SOF & Pl. Resp. ¶ 25; Dkt. 100-1, at 28.)

On September 17, 2011, while Plaintiff was in the cell on a phone call with his family, Reese returned to the cell. (IDOC SOF & Pl. Resp. ¶ 14.) Reese punched Plaintiff in the side of his face and then began beating Plaintiff with Plaintiff's own crutch. (IDOC SOF & Pl. Resp. ¶ 14; Dkt. 100-2, at 11-22.) At this point, a non-Defendant correctional officer arrived and called for backup. (Dkt. 100-1, at 36.) Officers eventually subdued Reese with the use of a chemical agent. (Dkt. 100-1, at 36.) None of the Defendants was present while the attack was ongoing, although Kirk arrived

---

[3] There is no suggestion that Kirk had anything to do with this assignment.
[4] Another inmate states that he overheard Kirk tell Reese that "sometimes, some of these stool pigeons need their ass beat." (Dkt. 100-1, at 30-31.)

after it ended. (Dkt. 134, at 3.) Plaintiff was taken for medical treatment immediately after the incident and other care for his injuries, which included a fractured nose. (Dkt. 134, 15 71; Dkt. 100-1, at 36; Dkt. 100-2, at 77:14-18, 95:12-96:18.)

Both Reese and Plaintiff were written disciplinary "tickets" for the incident. (Dkt. 134, at 71; Dkt. 100-1, at 36, 37-38, 42.) When released from medical custody, Plaintiff was sent to segregation. (Dkt. 134, at 72.) The conditions of segregation differed from those in general population only in that Plaintiff was denied his personal property, including his television and radio, and could not have visitors. (Dkt. 100-2, at 87:4-21.) Plaintiff protested against being placed in segregation, insisting that he was merely a victim, rather than an active participant in the fight. (Dkt. 100-1, at 24, 25, 27, 39.) Plaintiff's mother also wrote to Warden Hardy about the attack. (Dkt. 100-1, at 26.) On September 25, 2011, Plaintiff submitted a grievance, No. 3672, designated as an emergency, detailing the incident and his pre-incident requests for assistance from Defendants Tolley and Johnson. (Dkt. 100-1, at 33.) The Adjustment Committee, which included Defendants Bishop and Thompson, found Plaintiff guilty of fighting, emphasizing that Reese also had been treated for a head injury after the incident. (Dkt. 134, at 72.) Plaintiff was sentenced to 30 days of segregation, C grade status, and commissary restriction. (Dkt. 134, at 72-73.) Plaintiff protested against the committee's findings. (Dkt. 100-1, at 23, 39, 42.) It appears to be undisputed that the ticket ultimately was expunged from Plaintiff's record. (IDOC Def. SOF & Pl. Resp. ¶ 23.) On December 8, 2011, Plaintiff submitted a grievance, No. 4426, following up on grievances he said were dated August 30, 2011, and September 23, 2011. (Dkt. 100-1, at 19; Dkt. 100-5, at 11-12))

Plaintiff brought suit in 2012. The Court screened his original complaint pursuant to 28 U.S.C. § 1915A and found that Plaintiff stated a claim that Defendant Kirk had retaliated against

him for an earlier lawsuit against IDOC officials. (Dkt. 6, at 2.) The Court dismissed all other Defendants as to that claim. (*Id*.) Plaintiff submitted an amended complaint; the Court, upon screening, permitted Plaintiff to proceed on his amended complaint as to the existing retaliation claim and also as to a claim against all Defendants of deliberate indifference to serious risk of harm to Plaintiff stemming both from his cellmate and Plaintiff's serious medical needs after the incident. (Dkt. 50, at 2.) The Court received no objection to its screening order, and no further amended complaint was submitted. Plaintiff has since, however, abandoned any claim regarding his medical treatment following the injury.[5] Accordingly, for the purposes of the pending summary judgment motions, the following two claims are at issue: (1) retaliation as to Defendant Kirk; and (2) failure to protect Plaintiff from his cellmate, Reese, as to all Defendants.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Jajeh v. County of Cook*, 678 F.3d 560, 566 (7th Cir. 2012 (quoting Rule 56). When addressing a motion for summary judgment, this Court construes the facts and makes all reasonable inferences in favor of the non-movant. *Jajeh*, 678 F.3d at 566. The Court's role is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (citation and quotation marks omitted). "The Court may not weigh conflicting evidence . . . or make credibility determinations." *Omnicare, Inc. v. UnitedHealth Goup, Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (citations and quotation marks omitted); *see also Tolan*, 13 S. Ct. at 1866.

---

[5] The Court also notes that it discerns no basis for such a claim against these Defendants based upon the summary judgment record. It appears instead that Plaintiff promptly received treatment for his injuries after the incident with Reese and, moreover, received treatment for injuries he sustained. (Dkt. 134, 15 71; Dkt. 100-1, at 36; Dkt. 100-2, at 77:14-18, 95:12-96:18.)

The party seeking summary judgment has the initial burden of showing that there is no genuine dispute regarding his right to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010) (citation omitted). If the moving party demonstrates the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Id*.; *see also Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-movant must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Hannemann v. S. Door County Sch. Dist.*, 673 F.3d 746, 751 (7th Cir. 2012). A genuine issue of material fact exists only if there is evidence "to permit a jury to return a verdict for" the non-moving party. *Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 849 (7th Cir. 2010).

## DISCUSSION

The IDOC Defendants argue that summary judgment in their favor is appropriate, first, because Plaintiff failed to exhaust his administrative remedies regarding his claim that they failed to protect him against his cellmate, Reese, and, second, because they were not deliberately indifferent to the situation with Reese. Defendant Tolley asserts that she was not deliberately indifferent to a serious risk to Plaintiff from Reese.

## I.     FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

All Defendants argue that Plaintiff failed to exhaust available administrative remedies as to his deliberate indifference claims against them, as required by the Prison Litigation Reform Act (PLRA). *See* 42 U.S.C. § 1997e(a); *Woodford v. Ngo*, 548 U.S. 81, 87 (2006) (citing *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). Exhaustion requirements are set by prison grievance systems in each state, *see Jones v. Bock*, 549 U.S. 199, 218 (2007), and "[a] prisoner must

comply with the specific procedures and deadlines established by the prison's policy." *King v. McCarthy*, 781 F.3d 889, 893 (7th Cir. 2015). An inmate, however, must exhaust only such administrative remedies as are "available" to him. 42 U.S.C. § 1997e(a); *Ross v. Blake*, No. 15-339, --- S. Ct. ----, 2016 WL 3128839, at \*7 (June 6, 2016) ("An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones."). "Prison officials cannot immunize themselves from suit by establishing procedures that *in practice* are not available because they are impossible to comply with or simply do not exist." *King*, 781 F.3d at 893 (emphasis added); *see also Ross*, 2016 WL 3128839, at \*7-8. Administrative remedies also become "unavailable" when prison officials fail to respond to inmate grievances. *Lewis v. Washington,* 300 F.3d 829, 833 (7th Cir. 2002); *Brengettcy v. Horton,* 423 F.3d 674, 682 (7th Cir. 2005). "If administrative remedies are not 'available' to an inmate, then the inmate cannot be required to exhaust." *Kaba v. Stepp,* 458 F.3d 678, 684 (7th Cir. 2006). "Being excused from exhausting (i.e. appealing a grievance), however, would not also excuse Plaintiff from submitting a sufficient grievance" in the first place. *Godfrey v. Harrington*, No. 3:13-CV-280-NJR-DGW, 2015 WL 8908084, at \*2 (S.D. Ill. Sept. 23, 2015), *report and recommendation adopted,* No. 3:13-CV-280-NJR-DGW, 2015 WL 8605305 (S.D. Ill. Dec. 14, 2015). Defendants bear the burden of demonstrating non-exhaustion. *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013).

Illinois' administrative remedy for prisoners is set forth in the Administrative Code. 20 Ill Admin. Code § 504.800, et seq. Generally, a prisoner should first attempt to resolve any grievance informally by speaking with a counselor, 20 Ill. Admin. Code § 504.810(a), and, if that does not resolve his dispute, he may seek review at the institutional level through a written grievance to a grievance officer, who makes a recommendation to the warden, the chief administrative officer

(CAO) of the facility.  *Id*.; *see also Roberts v. Neal*, 745 F.3d 232, 235 (7th Cir. 2014); *Owens v. Hinsley*, 635 F.3d 950, 955 (7th Cir. 2011).  Alternatively, when an inmate believes he is raising an emergency issue, he may bypass the counselor and grievance officer and submit his grievance directly to the CAO.  20 Ill. Admin. Code § 504.840; *Roberts*, 745 F.3d at 236.  If the CAO agrees that the grievance involves an emergency, i.e., an issue presenting "a substantial risk of serious personal injury or other serious irreparable harm to the offender," the grievance handling is expedited.  As to emergency and non-emergency grievances, if the CAO's response does not resolve the issue to the inmate's satisfaction, he may appeal to the Administrative Review Board (ARB).  20 Ill. Admin. Code § 504.850(a); *Thornton v. Snyder*, 428 F.3d 690, 694 (7th Cir. 2005).[6]

The IDOC Defendants assert, relying upon a declaration by Leslie McCarty, Chairperson with the Office of Inmate Issues for IDOC, that Plaintiff failed to exhaust his administrative remedies.  McCarty asserts that she examined three grievances filed by Plaintiff.  She determined (apparently mostly from documents that do not appear in the record) that Plaintiff failed to timely appeal those grievances.  The Court respectfully disagrees that these Defendants are entitled to judgment on this issue.

First, as to the August 30, 2011/September 1, 2011 emergency grievance, No. 3623, the IDOC Defendants assert that Plaintiff received "the decision" on or about February 22, 2012, but failed to appeal until February 20, 2014.  (IDOC SOF ¶20.)  Oddly, no document establishing the date Plaintiff received "the decision" or of his appeal is provided.  The record as to exhaustion of this grievance is, at best, disputed.  First, given the IDOC Defendants' continued insistence that a

---

[6] The IDOC Defendants continue to assert, contrary to this circuit's long-settled law, *see Thornton*, 428 F.3d at 694, that if the CAO denies the emergent nature of the grievance, an inmate must resubmit his grievance as a non-emergency grievance and follow the entire procedure for such grievances before an appeal to the ARB.  (Dkt. 100-5, at 2.)  The Court's tolerance for such assertions is waning.

prisoner must resubmit a grievance when its emergent nature is denied (Dkt. 100-5, at 2), it appears that IDOC personnel (incorrectly) informed Plaintiff that he could not directly appeal the denial of his emergency nature of his grievance to the ARB. (See Dkt. 100-5 ¶ 5); *see also Thornton*, 428 F.3d at 694. The record is muddled as to what occurred after the CAO denied the emergent nature of his grievance, such that the Court cannot determine whether Plaintiff exhausted through appealing then. Second, Plaintiff disputes that he received a response from Defendants in February 2012. (Dkt. 136, at 3, 5; *see also* Dkt. 64, at 2 (stating that, as of February 24, 2014, Plaintiff had yet to receive a response to his grievances); Dkt. 100-1, at 50-51 (providing notes of January 25, 2012, and March 20, 2012, counselor responses to Plaintiff's requests for information regarding the status of his grievances, which are not easily reconciled with the dates provided in Defendants' summary judgment materials); Dkt. 121, at 217.) A failure to respond, effectively rendering the administrative remedy unavailable to Plaintiff, would excuse any failure to exhaust. *See Lewis,* 300 F.3d at 833; *Brengettcy,* 423 F.3d at 682 *Kaba,* 458 F.3d at 684. The IDOC Defendants' assertion that he did receive a response in 2012, at best, highlights a disputed material fact regarding exhaustion. The IDOC Defendants have not met their burden of proving Plaintiff's failure to exhaust this grievance.

The record is even murkier as to Grievances numbered 3672 and 4426. McCarthy's affidavit, which provides the factual support for Defendants' argument, contains a confused paragraph that begins with a discussion of grievance No. 3672 but refers to two other grievances within its body. (Dkt. 100-5 ¶ 9.) And, again, no supporting documentation is provided to aid the Court's review. Even assuming McCarthy meant to refer to No. 3672 throughout that paragraph, Defendants have not established a lack of a timely appeal as to that grievance, for the same two

reasons as stated above. Further, although Defendants assert that Plaintiff failed to attach the Grievance Officer's report and CAO's decision his appeal, and therefore did not comply with grievance procedures, this argument, too, is countered by Plaintiff's insistence that he did not receive a response to his grievance. He could not have attached a response he did not receive.

As to grievance No. 4426, the IDOC Defendants argue that Plaintiff's "was untimely for the same reasons" as grievances No. 3623 and 3672. This is not specific enough to explain the manner in which Plaintiff failed to exhaust available administrative remedies. Defendants provide no information regarding what happened after Plaintiff submitted that grievance, or the timing of Plaintiff's receipt of any response or of his appeal. The IDOC Defendants also have not met their burden of proving Plaintiffs' failure to exhaust grievances Nos. 3623 and 4426.

Defendant Tolley asserts that Plaintiff did not exhaust administrative remedies because, "he has not filed any grievance with respect to Dr. Tolley." (Dkt. 96, at 13-14; Tolley SOF ¶ 32.) The referenced supporting documentation, Ex. H, at 14-15, however, does not support Defendant Tolley's assertion; those pages are a portion of the deposition court reporter's certification and letter regarding the transcript. (Dkt. 95-17, at 14-15.) Further, Plaintiff included Defendant Tolley within his grievance dated September 25, 2011. (Dkt. 100-5, at 9.) Specifically, Plaintiff stated that he "had a call pass to see Mental Health Personnel Mrs. Tolley and informed her of the pass threats by Mr. Reese," and that Tolley told him she would follow up with IDOC officials. Accordingly, Defendant Tolley has not demonstrated that Plaintiff failed to exhaust his administrative remedies as to her.

## II.  RETALIATION BY DEFENDANT KIRK

Defendant Kirk does not move for summary judgment on the retaliation claim.  The Court therefore will not address it further, except to state that Plaintiff has highlighted record evidence generally tending to support his allegations on that claim.

## III.     FAILURE TO PROTECT AS TO ALL DEFENDANTS

Plaintiff claims that prison officials failed to protect him from his cellmate, Reese. Although "[j]ail officials have a duty to protect inmates from violent assaults by other inmates," *Rice ex rel. Rice v. Corr. Med. Serv.*, 675 F.3d 650, 669 (7th Cir. 2012) (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1988)); *see also Grieveson v. Anderson*, 538 F.3d 763, 775 (7th Cir. 2008) (stating that jail officials have duty to protect pretrial detainees from violence by other detainees), they "incur liability" as to a breach of such a duty only "when they were 'aware of a substantial risk of serious injury to [an inmate] but nevertheless failed to take appropriate steps to protect him from a known danger.'"  *Rice*, 675 F.3d at 669 (citing *Guzman v. Sheahan*, 495 F.3d 852, 857 (7th Cir. 2007)).   Jails, "after all, are dangerous places often full of people who have demonstrated aggression," and a constitutional violation does not occur "every time an inmate gets attacked by another inmate."  *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008). "[N]egligence is not enough." *Smith v. Sangamon Cty. Sheriff's Dep't*, 715 F.3d 188, 191 (7th Cir. 2014) (citations omitted). Accordingly, conveying to prison officials "only a generalized, vague, or stale concern about one's safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger," while "a complaint that identifies a specific, credible, and imminent risk of serious harm and identifies the prospective assailant typically will support an inference that the official to whom the complaint was communicated had actual knowledge of the risk."  *Gevas v. McLaughlin*, 798 F.3d 475, 480-81 (7th Cir. 2015) (citations omitted).

### A.  Defendant Tolley

Defendant Tolley asserts that she is entitled to summary judgment because, first, Plaintiff "made no claims of a specific threat" to his safety to her but merely complained of yelling and bullying by Reese, and, second, because Plaintiff has not established that Tolley was deliberately indifferent to his safety, given her status as a mental health care professional rather than a correctional officer employed by IDOC.  (Dkt. 96, at 6-12.)  The Court disagrees.

First, contrary to Tolley's claim that Plaintiff did not inform her of a specific threat to his safety (Dkt. 96, at 6-8), Plaintiff insists that he informed Tolley of "threats" by Reese, and that she said the threats were such that their continuation could lead her to "write [Reese] a ticket and place him in F-House segregation."  (Dkt. 100-5, at 9; Dkt. 100-3, at 124.)  While informing her of "harassment[] and threats by [his] cellmate," he was "uncontrollably crying, shaking and scared" as to "what might happen when [he] left that office."  (Dkt. 121, at 222.)  Tolley's notes from that visit indicate that Plaintiff "reported feeling depressed" and that his cellmate "constantly yelled at" and "bullied" him, and that he slept only one hour a night.  (Dkt. 95-15, at 1.)  The parties thus appear to dispute the content of Plaintiff's visit with Tolley.  Viewing the evidence in the manner most favorable to Plaintiff, a jury could find that the information Plaintiff says he reported to Defendant Tolley was sufficient to alert her of a specific threat to his safety from his cellmate.  After all, in contrast to cases in which inmates raised only a vague and unattributed fear of harm, *see, e.g., Dale v. Poston,* 548 F.3d 563, 569 (7th Cir. 2008) (holding that prisoner's "vague statement that inmates were 'pressuring' him and 'asking questions' were simply inadequate to alert the officers to the fact that there was a true threat at play"); *Klebanowski v. Sheahan,* 540 F.3d 633, 639–40 (7th Cir. 2008) (beyond expressing fear for his life, prisoner's statements to guards did not identify who was

threatening him or what the threats were); *Butera v. Cottey,* 285 F.3d 601, 606 (7th Cir. 2002) (prisoner only stated vaguely that he was "having problems" in his cellblock and "needed to be removed"), Plaintiff told Tolley of escalating conduct and threatening statements from a particular source, his cellmate. Although a reasonable jury might rule in Tolley's favor, the jury might also find that Tolley had notice of a serious enough threat from an identified source to require an appropriate response on her part. *See Haley v. Gross*, 86 F.3d 630, 643 (7th Cir. 1996) (affirming jury verdict against defendant where Plaintiff had told prison official that his cellmate was acting strangely, intimidating him, and that "something crucial was going to happen" if neither was moved).

Tolley next argues that Plaintiff's own testimony that she made a single phone call "to [Defendant] Johnson to inquire about the alleged situation" dooms his claim that she failed to adequately protect him from Reese's threats. (Dkt. 96, at 9.) In response, Plaintiff asserts that, although Tolley called Johnson, she got no answer. (Dkt. 121, at 222.) Tolley, without citation to record evidence, "objects to and disputes" any suggestion by Plaintiff "that she did not inform Ada Johnson." (Dkt. 131, at 4.) This alone demonstrates a genuine and disputed issue of fact – whether Tolley actually spoke with Johnson regarding Plaintiff's complaint regarding his cellmate. Even if Tolley spoke with Johnson, without more regarding what was said, the Court cannot determine, as a matter of law, that Tolley reasonably responded to the concerns Plaintiff communicated to her regarding his cellmate.

Tolley then contends that Plaintiff has not sufficiently demonstrated that she provided deliberately indifferent mental health treatment to Plaintiff. (Dkt. 96, at 9-10.) This argument misses the point. Although Plaintiff's submissions can be read to complain that Tolley removed him from

her caseload shortly after the incident with Reese, the Court does not understand Plaintiff to argue that he received no mental health treatment or that Tolley knew of any ongoing failures regarding medical or mental health treatment. As noted above, Plaintiff does not appear to argue that he received inadequate medical attention from any source, and Plaintiff asserts that he was transferred to the caseload of another mental health professional, Ms. Hart, about whom he does not complain. (Dkt. 12, at 222.) Instead, Plaintiff seems to argue that Tolley's post-incident behavior suggested that she may have felt guilty and/or wished to avoid further interactions with him.

Tolley finally argues that allowing Plaintiff to proceed to trial against her on a failure to protect claim would be paramount to imposing upon her a "duty" to "ensure transfer of inmates when the IDOC officials have the same information." (Dkt. 96, at 10.) Tolley's argument appears to conflate two concepts. First, Tolley seems to argue that she, as a mental health professional rather than an IDOC official involved in the day-to-day operations at Stateville, has no duty or authority to cause a cell transfer. Second, she suggests that, even if she had some responsibility to act when faced with conditions such as those presented here, it is obviated where IDOC officials with such day-to-day operational control have the same knowledge. Accordingly, she reasons, she is entitled to summary judgment. The Court again respectfully disagrees.

First, Plaintiff seems to dispute whether Tolley's power is as limited as she asserts; he testified that Tolley could have requested a cell transfer and had done so for him in the past. (Dkt. 100-4, at 17:10-18.) But even that misses the point. Tolley need not have possessed the power to actually effect a cell transfer for Plaintiff to be subject to liability for a failure to protect him. Tolley's obligation was to "take appropriate steps" to protect him. *Rice*, 675 F.3d at 669 (citing

*Guzman*, 495 F.3d at 857). As noted above, it is for the jury to decide whether she did so under the circumstances presented here.

While not every person who could be charged with knowledge of a potentially serious risk of harm may be subject to liability under § 1983, the Court knows of no authority for the proposition that a defendant who is aware of a substantial risk to an inmate's safety need not act if she knows that another with as much (or even more) authority to act upon the danger possesses the same knowledge. On the contrary, courts routinely hold multiple defendants responsible for failure to protect. *See Haley*, 86 F.3d 642-43 (affirming jury verdict against multiple defendants based on facts within their knowledge and their own actions or inactions). The facts of each claim generally must be examined. The Court emphasizes, however, that this is not a case in which Plaintiff is seeking to hold Tolley (and scores of other individuals) responsible for the actions or inactions of far-distant underlings to whom her authority was delegated, *Burks v. Raemisch*, 555 F.3d 592, 593-96 (7th Cir. 2009); *Steidl v. Grambley*, 151 F.3d 739, 741 (7th Cir. 1998), or for merely following a specific prison grievance procedure regarding the timing of filing grievances, *Burks*, 555 F.3d at 595-96. Nor does Tolley suggest that intricate knowledge outside her ken would have been required to take any action to protect Plaintiff or that she reasonably relied upon some indicator that another with proper authority was actually acting to assist Plaintiff. *See id*. at 596; *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993). Tolley reputedly had specific knowledge of a potentially serious threat to Plaintiff's safety. The Court cannot say, as a matter of law, that it would have been reasonable for Tolley to rely solely on Plaintiff having told her that he reported his concerns regarding his cellmate to correctional officials, particularly where, as here, Plaintiff was complaining that no action had occurred.

**B.     Defendant Johnson**

Defendant Johnson argues that Plaintiff's sole letter to her was insufficient to put her on notice of a substantial risk of harm posed to him by his cellmate because the letter "only indicated that [Plaintiff] was having a 'standoff' with his roommate" but "'not fighting.'" (Dkt. 101, at 5.) Relying upon *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004), Johnson emphasizes that prisoners may be "manipulative and cry 'wolf' in an effort to have a cell to themselves or choose a favored cellmate," while others may "perceive specters in every shadow, even though their fears are unsupported," requiring guards to "discriminate between serious risks of harm and feigned or imagined ones." She asserts that "the record is utterly devoid of evidence that [she] . . . actually believed that Plaintiff faced imminent harm." (*Id*. at 6.) Johnson's argument is flawed.

Johnson omits much of the information contained within Plaintiff's letter, and a jury might find that the letter, as a whole, was sufficient to alert her of a serious risk of harm to him from his cellmate. Plaintiff told Johnson, in his letter dated September 7, 2011, 10 days prior to the incident, that the cellmates' "standoff" required him to just lay in bed to stay out of his cellmate's way and that circumstances were bad enough that Plaintiff began a hunger strike that he aborted on the advice of a sergeant. And, unlike the plaintiff in *Riccardo*, who, after initially claiming that he feared for his life because of his cellmate, later disclaimed having a problem with that cellmate, 375 F.3d at 526-27, Plaintiff never suggested to Johnson that his fear had abated. And, unlike the *Riccardo* defendant, Johnson does not offer any explanation for her apparent inaction when presented with knowledge of a potential threat to Plaintiff. While a reasonable jury might conclude that inaction was appropriate given some other factors within Johnson's knowledge, or that inaction was appropriate based solely on the information in Plaintiff's letter, the jury might instead

reasonably conclude that more was required from her.  *See, e.g., Haley,* 86 F.3d at 643 (upholding

jury verdict against sergeant where prisoner advised sergeant that cellmate was intimidating him,

acting strangely, had threatened that "something crucial was going to happen" if one of them was

not moved, and was now "deadlocked" in cell, which restricted entry and exit from cell); *see also*

*Riccardo*, 375 F.3d at 525 (stating that "the objective and subjective components of the eighth

amendment" generally "are for the jury in the first instance").

C.     **Defendant Kirk**

Defendant Kirk suggests that Plaintiff did not inform him of any problems with his cellmate,

such that Kirk lacked knowledge sufficient to intervene to protect Plaintiff.  (See Dkt. 101, at 5.)

This ignores that Kirk is said to have placed Plaintiff in danger by shouting that Plaintiff was a

"stool pigeon" (i.e., a snitch, *see Merritte v. Kessel,* 561 Fed. App'x 546, 548 (7th Cir. 2014)).  Due

to the "obvious danger associated with a reputation as a snitch," jail officials may violate an

inmate's constitutional rights by "label[ing] him a snitch" to other inmates, *Benefield v. McDowall*,

241 F.3d 1267, 1271 (10th Cir. 2001), at least when the inmate suffers physical harm at the hands of

other inmates as a result.  *Saunders v. Tourville*, 97 Fed. Appx. 648, 649 (7th Cir. 2004); *see also*

*Valandingham v. Bojorquez*, 866 F.2d 1135, 1137-39 (9th Cir. 1989) (overturning summary

judgment for defendants on similar claim); *Harmon v. Berry*, 728 F.2d 1407, 1409 (11th Cir. 1984)

(reversing summary dismissal on similar claim); *see also Dale v. Poston*, 548 F.3d 563, 570 (7th

Cir. 2008) (noting that "it's common knowledge that snitches face unique risks in prison").  Here,

although the record is somewhat confused as to the impetus of Reese's altercation with Plaintiff,

Plaintiff provides sufficient evidence to permit an inference that Kirk placed him in danger by

calling him a stool pigeon and that Reese's attack may have been motivated at least in part due to

the stool pigeon designation. (Dkt. 100-1, at 30-31; Dkt.100-2, at 75:6-76:6, 79:13-80:2.) A reasonable jury could therefore infer that Kirk had a duty to protect Plaintiff after labeling him a stool pigeon to his cellmate. *See Kaba v. Stepp*, No. 01-CV-150-WDS, 2008 WL 4147030, at * (S.D. Ill. Sept. 3, 2008) ("A reasonable jury could infer from [defendant]'s solicitations that the attack on plaintiff occurred as a result of [defendant]'s conduct.").

### D. Defendants Thompson, Bishop, Hardy, Edwards, and Coleman.

Plaintiff has not referred the Court to any record evidence to suggest that Defendants Thompson, Bishop, Hardy, Edwards, or Coleman were notified, in any fashion, of Plaintiff's concerns regarding Reese prior to the incident leading to Plaintiff's injuries. They are not properly named as Defendants to any failure to protect Plaintiff from his cellmate, therefore.

It appears that Plaintiff may have named these Defendants due to their perceived roles in the disciplinary process that led to Plaintiff serving a 30-day stint in segregation. The disciplinary ticket ultimately was expunged after Plaintiff's segregation term had ended. Defendants Thompson and Bishop were on the committee that imposed the discipline. Plaintiff wrote to both Defendant Edwards and Defendant Hardy[7] after the incident with Reese to complain about the discipline;

---

[7] It also may be that Plaintiff seeks to hold Defendants Coleman and Hardy liable for not removing Kirk from his vicinity after Plaintiff submitted his September 1, 2016 grievance, No. 3623. (See Dkt. 100-1, at 18, 21; Dkt. 100-5, at 5-6.) However, the behavior set forth in the grievance itself, although suggesting that Kirk behaved in an unprofessional manner by expecting Plaintiff to walk faster despite his limitations and having Plaintiff reassigned a new cellmate after staring and gesturing in Plaintiff's direction, does not contain sufficient information to put high-level officials on notice of a serious threat of harm to Plaintiff from Kirk. *See DeWalt v. Carter*, 224 F.3de 607, 612 (7th Cir. 2000) ("Standing alone, simple verbal harassment does not constitute cruel and unusual punishment, deprive a prisoner of a protected liberty interest, or deny a prisoner equal protection of the laws."). Plaintiff now provides additional details that, if included in the grievance, might have done so—such as that Kirk subjected him to an allegedly retaliatory and painful search, that Kirk knew that Croutter, who was to be roomed with Plaintiff, presented a danger to Plaintiff, that Kirk delayed Plaintiff's move to protective custody, or called Plaintiff a stool pigeon to other inmates. Although the Court has, for the purposes of this opinion and order, excused any failure to exhaust administrative remedies through timely appeals of his grievance regarding Kirk, Plaintiff was not excused from providing the information necessary to alert Defendants as to any specific threat to his safety from Kirk, to the extent he seeks to hold them liable for a failure to intervene. *See Godfrey*, 2015 WL 8908084, at *2. Such a claim against Defendants Coleman and Hardy could not survive summary judgment, had Plaintiff been permitted to proceed on that claim.

Defendant Edwards responded, referring Plaintiff to the grievance process for a resolution of his complaint. (Dkt. 100-1, at 23, 24, 32.)

To the extent the current record suggests that Plaintiff meant to raise a due process claim against these Defendants for his 30-day segregation term, such a claim must fail. An inmate has a due process liberty interest in being in the general prison population only if the conditions of his or her disciplinary confinement impose "atypical and significant hardship[s] . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see also Wagner v. Hanks*, 128 F.3d 1173, 1175 (7th Cir. 1997) (noting that, in light of *Sandin*, "the right to litigate disciplinary confinements has become vanishingly small"). In determining whether a disciplinary segregation term imposes such "atypical and significant hardships," courts look to "the combined import of the duration of the segregative confinement *and* the conditions endured by the prisoner during that period." *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697-98 (7th Cir. 2009) (emphasis in original). For relatively short periods of disciplinary segregation, a court need not inquire into the specific conditions of confinement because the short duration of the disciplinary segregation forecloses any due process liberty interest regardless of the conditions. *See Lekas v. Briley*, 405 F.3d 602, 612 (7th Cir. 2005) (56 days); *Thomas v. Ramos*, 130 F.3d 754, 761 (7th Cir. 1997) (70 days) ("a relatively short period when one considers his 12 year prison sentence"); *Marion*, 559 F.3d at 698 ("[W]e have affirmed dismissal without requiring a factual inquiry into the conditions of confinement."). Here, Plaintiff was confined to segregation for only 30 days; such a short term of segregation does not implicate a liberty interest. *See Means v. Larson*, 580 Fed. App'x 481, 482 (7th Cir. 2014) ("But Means' term of just over one month, by itself, did not implicate a liberty interest.").

Even if the Court were to examine the conditions of confinement, Plaintiff's claim cannot proceed. For prisoners whose punishment includes being put in disciplinary segregation, under *Sandin*, "the key comparison is between disciplinary segregation and nondisciplinary segregation rather than between disciplinary segregation and the general prison population." *Wagner*, 128 F.3d at 1175. Here, Plaintiff testified that only a few small differences separated confinement in segregation and confinement from even the general population—he was deprived of personal property and visitation. These conditions are not harsh as to implicate the Constitution. *See Hardaway v. Meyerhoff*, 734F.3d 740, 744 (7th Cir. 2013) (noting that conditions are sufficiently harsh where inmates are deprived "of virtually all sensory stimuli or human contact for an indefinite period of time" and that reduced shower and yard usage were insufficient) (citing *Wilkinson v. Austin*, 545 U.S. 209, 214-15 (2005)). Summary judgment is granted to Defendants Thompson, Bishop, Hardy, Edwards, and Coleman.

## CONCLUSION

For the reasons stated in this Memorandum Opinion and Order, Tolley's motion for summary judgment [94] is denied. The IDOC Defendants' motion to strike (filed as their reply) [156] is denied. The IDOC Defendants' motion for summary judgment [99] is granted in part and denied in part. Defendants Thompson, Bishop, Hardy, Edwards, and Coleman are dismissed. The motion is denied as to Defendants Kirk and Johnson. The case is set for status on July 27, 2016 at 9:15 a.m. The parties are directed to discuss potential resolution of this lawsuit prior to the status date.


**DATE: June 27, 2016**              \\s **James B. Zagel**